**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Joan B. Gottschall |
| GRACE ELIZABETH REISINGER and ROF CONSULTING, LLC, | ) ) ) | Case No. 11 C 8567 |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

The U.S. Commodity Futures Trading Commission ("CFTC") filed a six-count complaint against Grace Elizabeth Reisinger and ROF Consulting, LLC ("ROF"), alleging that while acting as commodity pool operators ("CPOs") of NCCN, LLC ("NCCN" or "the pool"), Reisinger and ROF committed fraud by misrepresenting and omitting material facts in communications with actual and prospective pool participants. They also allegedly failed to register as CPOs. The CFTC alleges that Reisinger and ROF violated the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1 *et seq*., and the CFTC regulations promulgated thereunder. Now before the court is Reisinger's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, based in part on the statute of limitations governing agency actions for civil penalties. For reasons explained below, the court grants the motion in part. The CFTC is barred by the statute of limitations from seeking civil penalties for violations premised on conduct occurring prior to June 29, 2006, but it may seek other forms of relief against Reisinger for such violations. Civil

penalties may be available for any violations of the Act committed after June 29, 2006, including violations committed by Reisinger while continuing to operate the pool after that date.

## I. FACTS

The CFTC is an independent federal regulatory agency charged with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq*., and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq*. The CFTC has authority to bring actions seeking civil penalties and injunctive relief for violations of the Act. 7 U.S.C. § 13a.

In this case, the CFTC alleges violations of several sections of the Act: 7 U.S.C. §§ 6b(a)(2)(i) and (iii), 6c(b), 6*o*(1)(B), 6m(1), and 6n(4).[1] The CFTC also alleges violations of CFTC regulations §§ 4.13(a)(4), 4.22, and 33.10(a) and (c), 17 C.F.R. §§ 4.13(a)(4), 4.22, 33.10(a) and (c) (2005). The language of these sections is set out in full in the discussion below of the six counts of the CFTC's complaint. Generally, the sections prohibit fraud or deceit in connection with commodities transactions, require CPOs to register unless they qualify for an exemption from registration, and require registered CPOs to provide annual reports and account statements to commodity pool participants.

Reisinger, along with several other persons, was a member and organizer of ROF. ROF offered a commodity pool—a commodity futures investment in which the investors' funds were

---

[1] The Act was amended during the relevant period, in ways immaterial to this opinion, by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110–246, Title XIII, §§ 13101–13204, 122 Stat. 1651 (enacted June 18, 2008). Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) (2006), were revised and renumbered as §§ 4b(a)(1)(A) and (C), codified at 7 U.S.C. § 6b(a)(2)(A) and (C). For simplicity, the court cites to the pre-2008 version of the Act.

pooled and traded—under the name NCCN.  Reisinger was also an associated person and branch manager for New World Holdings, LLC ("NWH"), an introducing broker in Chicago, Illinois.[2]

## A. The CFTC Investigation of NCCN

On January 10, 2008, the CFTC received a request for assistance from the Australian Securities and Investments Commission ("ASIC").  ASIC sought information and records from a futures commission merchant, Cadent Financial Services, LLC ("Cadent"), in relation to the following accounts opened by Cadent: Idylic Solutions Ltd., PJCB International Ltd., Geneva Financial Ltd., David Hobbs, Brian Wood, Jimmy Truong, and David Collard.  ASIC advised that these persons and entities were relevant to its investigation of an unregistered offshore managed investment fund operating in Australia called the "Super Save Superannuation Fund."  ASIC requested no information concerning ROF, Reisinger, or NCCN.

The CFTC issued a request for records to Cadent on January 23, 2008.  The request was limited to the persons and entities identified above and required a response by February 4, 2008.  As a result of obtaining information from ASIC about potential fraudulent activity associated with U.S. commodity accounts, the CFTC opened an investigation of Idylic Solutions Ltd. on January 24, 2008.

On February 8, 2008, the CFTC sent a request for documents to NWH, the introducing broker who introduced the accounts for the persons and entities identified by ASIC.  The CFTC contacted NWH's counsel to solicit voluntary testimony concerning these accounts.  On May 20, 2008, the CFTC took the testimony of Reisinger in her capacity as an associated person and branch manager of NWH. During that testimony, NCCN came to the CFTC's attention when Reisinger mentioned it as an entity of which she was a member.  At the time, the CFTC had no

---

[2]     "An Introducing Broker (IB) . . . solicits or accepts orders to buy or sell . . . commodity options, . . . but does not accept money or other assets from customers to support such orders." http://www.nfa.futures.org/nfa-compliance/NFA-introducing-brokers/ index.HTML.

other information about NCCN or ROF, or about potential violations of the Act or CFTC regulations by Reisinger or ROF.

On August 20, 2008, ASIC investigator Barry Taylor contacted the CFTC. On or about August 21, 2008, Taylor notified the CFTC that a U.S. resident named Donald B. Caffray might have been involved in the transfer of funds for the persons and entities identified in ASIC's January 10, 2008 correspondence. Taylor noted that these funds were "transferred to Mr. Caffray, then he would be instructed to . . . wire transfer these monies to the bank account of ROSS, LLC, and that ROSS, LLC would transfer the monies to the bank account of NCCN, LLC who would then transfer the funds to Cadent for the benefit of the NCCN Commodities Pool." Subsequently, Taylor clarified that "ROSS, LLC" was actually ROF.

On September 23, 2008, the CFTC took Reisinger's testimony again. Reisinger was asked to explain the structure of NCCN, its history and business activities, and its involvement in the commodity markets. As a result of the additional information obtained from Reisinger's September 23, 2008, testimony, the CFTC began to investigate whether potential violations of the Act and CFTC regulations had occurred in relation to the operation of NCCN.[3]

## B. Reisinger's CPO Registration Exemption Claim

CPOs are required to register under the Act unless they qualify for an exemption. 7 U.S.C. § 6m(1). The National Futures Association ("NFA") administers the registration system for the CFTC. CFTC regulation § 4.13 allows a CPO to claim an exemption from registration if certain requirements are met. One way to qualify for an exemption is to claim that

---

[3] Reisinger argues that the questioning shows that the CFTC was already investigating the pool on September 23, 2008. For reasons explained below, however, the date on which the CFTC became aware of potential violations of the Act and CFTC regulations is not relevant to the dispute at hand.

(i) Interests in the pool are exempt from registration under the Securities Act of 1933, and such interests are offered and sold without marketing to the public in the United States; [and]

(ii) The [CPO] reasonably believes, at the time of investment . . . that:

(A) Each natural person participant . . . is a 'qualified eligible person,' as that term is defined in § 4.7(a)(2); and

(B) Each non-natural person participant is a 'qualified eligible person,' as that term is defined in § 4.7, or an 'accredited investor'."

17 C.F.R. § 4.13(a)(4).  Section 4.7(a)(2)(xi) defines "qualified eligible person" ("QEP") to include "A Non-United States person."

To claim an exemption, the CPO must file with the NFA a notice of exemption from CPO registration.  § 4.13(b)(1).  The notice must provide the contact information and signature of the CPO, the name of the pool, and the section pursuant to which the exemption is claimed.  It must also "represent that the pool will be operated in accordance with the criteria of that paragraph."  *Id.*  The notice must be filed "by no later than the time" the CPO "delivers a subscription agreement for the pool to a prospective participant."  § 4.13(b)(2).  "The notice will be effective upon filing, provided the notice is materially complete."  § 4.13(b)(3).

The NFA received from Reisinger a written claim for exemption from CPO registration dated May 5, 2005, (the "Exemption Claim").  The Exemption Claim is stamped "Received NFA Compliance June 24, 2005." (Def.'s Statement of Undisputed Facts ("SOF") Ex. D (Spight Dep.) 12:8-20, ECF No. 51-4.)  NFA employee Michelle Spight reviewed the Exemption Claim.  She testified that she checked that the form included "[t]he language that the exemption should hold, which is from the commodity futures book," that the language was accurate, and that the form included a signature and phone number.  (*Id.* at 15:3-5, 13-19.)

The Exemption Claim identified the name of the pool as "NCCN, LLC" and "NCCN LLC an Nevada LLC." (Def.'s SOF Ex. C (Exemption Claim), ECF No. 51-3.) In the Exemption Claim, Reisinger stated,

> I reasonably believe, at the time of investment, [e]ach natural person[] participant is a 'qualified eligible person,' as that term is define[d] in 4.7(a)(2) and . . . [e]ach Non-natural person participant is a 'qualified eligible person,' as that term is defined in 4.7, or a[n] 'accredited investor.' as the term is defined in 230.501(a)(i)-(3)(a)(7) and (a)(8).

(*Id.*) No notice of exemption was filed on behalf of ROF.

## C. Operation of the NCCN Pool

NCCN was organized on October 14, 2004. According to the records of the Nevada Secretary of State, the members/managers of the pool were ROF and Sun Coast Investments and Consulting, Inc. ROF operated the pool. Along with Reisinger and two others, Larry Alan Matthews was a member, manager, and principal of ROF. Reisinger testified that she could make emergency business decisions on behalf of the pool. (Pl.'s SOF Ex. 2 (Reisinger Dep.) 57:19 - 58:1, ECF No. 55-3.) She stated that she "felt like [she] was the broker that picked the traders" and that she allocated funds to the traders. (*Id.* at 58:10-16, 33:5-8.) She could fire the traders. (*Id.* at 58:17-18.) She stated that, in her view, Matthews was the pool operator. (*Id.* at 58:19-20.) Matthews's title in NCCN was treasurer, while Reisinger's was CEO. (*Id.* at 32:19-21.) Reisinger testified that "all four members" of ROF ran the daily operations of the pool. (*Id.* at 33:11-20.)

The pool sent prospective client questionnaires, one of which bore Reisinger's stamped signature, to prospective investors. The two questionnaires identified by the CFTC stated that the pool was open to "Accredited Investors who are also Qualified Purchasers," and that "[t]he minimum investment required per entity is $5,000,000 USD." (Pl.'s SOF Ex. 6 (Prospective

Client Questionnaire), ECF No. 55-6.) "Client services agreements" were delivered to some prospective pool participants. Two of the three agreements identified by the CFTC were signed on behalf of the pool by James Green, and one was signed by Matthews. The agreements were executed on March 8, 2005.

1. The Donald Caffray Client Trust Account

Donald Caffray was an attorney located in California who used an attorney-client trust account at Bank of America called the Donald Caffray Client Trust Account ("the Caffray Account") to transmit funds to ROF and NCCN. On or about February 28, 2005, the pool provided a questionnaire containing Reisinger's stamped signature to the Caffray Account to determine its interest and qualifications for unspecified investments. (Prospective Client Questionnaire.) The questionnaire stated that if the recipient wished to receive a "confidential Client Services Agreement," it should return the letter and include additional information. (*Id.*)

Reisinger testified that Caffray completed the questionnaire in connection with investments he held at Morgan Keegan and Merrill Lynch. (Reisinger Dep. 40:7-15.) She testified that Caffray qualified as a QEP based on his net worth as a natural person, based on paperwork he filled out "when he started at Merrill Lynch and Morgan Keegan where he specified that he was worth over one million and everything in his trust account was qualified eligible persons or accredited persons." (*Id.* at 40:7-15.) Reisinger further testified that she didn't "know how much of [the money in the Caffray Account] was Australian and how much was U.S. or who that belonged to." (*Id.* at 24:15-18.) She also stated that she did not know whether Caffray invested any of his own money in NCCN. (*Id.* at 49:4-8.)

According to Matthews, "Caffray was a conduit for funds coming from foreign investors to the NCCN pool." (Pl.'s SOF Ex. 15 (Matthews Dep.) 40:8-9, ECF No. 55-16.) Clients sent

funds to Caffray's trust account, Caffray wired them to a ROF account, ROF transferred them to an NCCN account, and NCCN transferred them to Cadent, all through electronic wire transfers. (*Id.* at 40:13-18.) Matthews testified that a foreign investor would "send information of pending wire[s] to Ms. Reisinger who would either e-mail or call myself to advise Don Caffray that he will be receiving a wire from somebody. Then the funds would be wired to Don Caffray." (*Id.* at 50:3-7.)[4] The wired funds would then be transferred to ROF's bank account, then transferred to NCCN's bank account, and then wired into the NCCN commodity pool account at Cadent.[5]

### 2. The NCCN Commodity Futures Account

The NCCN commodity futures account at Cadent was opened by signatories Reisinger and Matthews on or about May 5, 2005. At this point, NCCN became a commodity pool. The purpose of the account at Cadent was to trade commodities. NCCN pool participants deposited funds into the account starting on May 6, 2005. The first deposit on May 6, 2005, was in the amount of approximately $1,000,000. Trading of pool funds began on May 18, 2005.

Reisinger testified that, after the pool began trading, she learned that unnamed clients were sending funds to the Caffray Account, which were invested in the pool. She claimed that "in the beginning," she was unaware that the funds in the Caffray Account were from unnamed

---

[4]    Reisinger argues that this statement is contradicted by an August 2008 email from an investigator to Matthews discussing wire transfers from a foreign investor named Wood to Caffray's account, but the email is not inconsistent with the statement. It states:

> I note your recollection that in respect of funds transferred to Mr Caffray's client trust account that normally you would receive a CC of an e-mail from Mr. Wood to Lisa Reisinger that advised of the funds transfer and that you would then issue instructions to Mr Caffray for him to on transfer the funds to [the ROF] bank account.

(Pl.'s SOF Ex. 20 (Taylor email) 4, 55-21.)

[5]    Reisinger contends that the wires were sent by Matthews, but the testimony of Matthews that she cites does not state that he made the deposits into the pool account, or explain who did so. (*See* Matthews Dep. 40, 109-10.)

clients, but learned that was the case "[a]t some point in time." (Reisinger Dep. 50:12-14.) She

testified, "At first it was my understanding that it was his and a few clients. . . . Later I learned

that it was different managers over in Australia that had invested with Mr. Caffray." (*Id*. at 24:5-

11.) She testified that she did not know the names of Caffray's clients until she "started getting

faxes from [Matthews]." (*Id*. at 49:4-18.)

In May 2006, Reisinger received a communication from State Management Limited

stating that it was an investor with Caffray and wanted its funds returned. That communication

led Reisinger to conclude that Caffray was collecting funds from third parties and depositing

them into the NCCN pool. This information concerned Reisinger because she realized that the

actual source of the funds might not be a QEP. Approximately thirty days later, Reisinger

received another request for a return of funds from a participant in the Caffray Account. After

receiving the State Management Limited inquiry, Reisinger sought information from Matthews

about the identity of participants sending funds through Caffray. She learned that at least three

additional participants had contributed funds to the NCCN pool through Caffray. Reisinger had

documentation supporting the QEP status of only one Caffray client, Secured Bond. (*Id*. at

54:10-22.)

On or about January 6, 2007, Reisinger sent an email asking whether the total amount of

$335,000 referred to in a fax included "Tonga church money" in the amount of $249,918. (*Id*. at

111:4-17.) Reisinger testified that Matthews told her that some money invested in the pool had

come from a Tongan church for which she had no QEP paperwork and that this was upsetting to

her. (*Id*. at 114:1-16.)

Pool participants continued to make deposits into the Cadent Account until January 10,

2007. On that date, the last deposit into the account was made, in the amount of $301,845. On

May 9, 2007, Reisinger received an email regarding Michael and Sue Cassidy, an Australian couple. In August 2007 and October 2007, Reisinger had conversations with the Cassidys about the nature of their investment with Caffray. She stated that she believed based on the conversations that they were not "qualified eligible participants, and it gave [her] cause to finally shut down" the pool. (Pl.'s SOF Ex. 12 (Reisinger Dep. II) 758:1 - 759:13.) The pool was dissolved on October 26, 2009.

Throughout the period of operation of NCCN, no participant ever deposited a total of $5,000,000; the total deposited by *all* participants into the account at Cadent was $2,753,378. The single largest sum deposited was approximately $1,000,000. CFTC investigator George Malas stated in an affidavit that "at no point during the relevant period did Reisinger, a CPO and a fiduciary, correct her earlier representations to pool participants that the minimum deposit accepted by the NCCN pool was $5,000,000." (Pl.'s SOF Ex. 7 (Malas Decl.) ¶ 25, ECF No. 55-8.) Reisinger, however, contends that she never personally represented to investors that the minimum deposit accepted by the NCCN pool was $5,000,000, that the questionnaires sent to prospective pool participants do not identify which investment required a $5,000,000 minimum investment, and that the court should not rely on the questionnaires because they are not authenticated.

3. Reisinger's Failure to Register as a CPO, Provide Statements to Investors, and Notify Pool Participants or the CFTC of non-QEP Investors

From the time NCCN became a commodity pool until the date it was dissolved, neither Reisinger nor ROF registered as a CPO. Pursuant to CFTC regulations, registered CPOs are obligated to provide monthly account statements and annual reports to their pool participants. Reisinger and ROF did not provide pool participants with these statements and reports.

None of the documents produced to the CFTC by Reisinger demonstrated that she communicated to the pool participants that all members of the NCCN pool were not QEPs. (Maras Decl. ¶ 27.) Reisinger did not notify the NFA that non-QEPs were participating in the pool. Reisinger also testified that she never notified Cadent that third party funds were part of the pool.

Reisinger testified that she did not provide such notification because, "I didn't look at it that way. I looked at it as Mr. Caffray was our client and his attorneys—he was an attorney and that he was knowledgeable of the law." (Reisinger Dep. 53:9-15.) She testified that, although she knew as of May 2006 "that he had other investors, [she] still looked at Mr. Caffray as the client." (*Id.* at 54:2-4.) She acknowledged that, if Caffray were the client, the money invested in the pool was "supposed to be his." (*Id.* at 54:5-9.)

The CFTC identified persons participating in the pool which it alleges were not QEPs. It identified the following participants and locations: Integrity Plus Fund, Australia; Hunter Valley Transport, Ltd., Australia; G. P. Global Ltd., Australia; Secured Bond, Ltd. P. O. Box 4116, Oatley West, NSW, Australia; State Management Ltd, Suite 101, 58 High Street, Toowong, Queensland 4066, Australia; Tokaikolo Christian Church, P.O. Box 367, Nuku'alofa, Tonga; Quality Safety Management, Australia; and P.J.C.B. International, Ltd., Anguilla. Reisinger argues that these were all non-U.S. persons who are QEPs as a matter of law, making her earlier belief that the Cassidys and others were not QEPs incorrect.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). The court ruling on the motion construes

all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is called for when the nonmoving party is unable to establish the existence of an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. ANALYSIS

Reisinger argues that CFTC's complaint should be dismissed in its entirely because the CFTC failed to bring its case against her within the five-year statute-of-limitations period, and the case is now time-barred. To the extent that the pool continued to operate within the limitations period, she argues that her CPO registration exemption claim was valid and that she committed no violations of the Act or CFTC regulations.

## A. The Limitations Period and the Discovery Rule

The parties agree that claims by the CFTC for civil penalties are governed by the five-year limitations period set out in 28 U.S.C. § 2462, which states:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462. The court concurs that, as the Act does not contain an express statute of limitations, § 2462 governs the CFTC's civil penalty claims.

Reisinger submitted an Exemption Claim to the NFA that was dated May 5, 2005, and was marked as received by the NFA on June 24, 2005. This action was filed on June 29, 2011, more than six years after the Exemption Claim was filed and the pool began operating. The CFTC argued in its response to Reisinger's motion for summary judgment, however, that the

statute of limitations was tolled until at least September 23, 2008, when it received notice of the possibility of unlawful conduct through Reisinger's testimony, and that the five-year limitations period began to run on that date.

The CFTC's tolling argument was largely foreclosed when, on February 27, 2013 (after this motion was briefed), the Supreme Court held in *Gabelli v. SEC*, __ U.S. ___, 133 S. Ct. 1216 (2013), that the "discovery rule" does not apply to actions brought by the SEC to seek civil penalties, which are also governed by the limitations period in § 2462. The Court rejected a rule that would toll the limitations period until the government discovered a potential violation of securities law. It distinguished the government, with its myriad tools of investigation and enforcement, from "an individual victim who relies on apparent injury to learn of a wrong." *Id.* at 1222. Nothing in *Gabelli* suggests that the same reasoning does not apply to the efforts of other federal agencies, including the CFTC, to bring claims for civil penalties; the Court's analysis focused on the proper reading of § 2462 itself. This court therefore concludes that the CFTC's civil penalty claims against Reisinger for conduct occurring before June 29, 2006, are time-barred.[6]

Section 2462, however, applies only to suits seeking civil penalties. This court's jurisdiction under 7 U.S.C. § 13a-1 also gives it the authority to issue injunctions and award other types of equitable relief, such as restitution or disgorgement. *See CFTC v. Wilshire Inv.*

---

[6] The Supreme Court left open the possibility that the doctrine of fraudulent concealment would allow tolling of the limitations period "when the defendant takes steps beyond the challenged conduct itself to conceal that conduct from the plaintiff. *Gabelli*, 133 S. Ct. at 1220 n.2. But in this case, the CFTC's argument for tolling rests entirely on the fact that it was not on notice of potential wrongdoing until Reisinger's September 23, 2008, testimony. Even if the CFTC casts the tolling it seeks as "equitable tolling" or "tolling based on fraudulent concealment," it is effectively arguing that the discovery rule should apply to toll the limitations period. It has not identified acts taken by Reisinger beyond the challenged conduct that served to conceal potential violations. The court thus finds no support for a fraudulent concealment argument justifying tolling.

*Mgmt. Corp.*, 531 F.3d 1339, 1344 (11th Cir. 2008) ("[A] court's jurisdiction under § 13a-1 includes equitable remedies . . . . , among which is the power to grant restitution."). That means that not all remedies sought by the CFTC for violations that occurred before June 29, 2006, are necessarily time-barred. In addition to civil monetary penalties, the CFTC seeks injunctive relief barring Reisinger from trading futures or being registered with the CFTC in the future, injunctive relief to prevent Reisinger from violating the Act in the future, an order for restitution of investor losses, and an order for disgorgement of ill-gotten gains. (Compl. 28-30, ECF No. 1.)

Reisinger argues that each form of relief sought by the CFTC is a civil penalty barred by the statute of limitations, because the relief would penalize her. She relies heavily on *SEC v. Microtune*, in which a Northern District of Texas court stated that a court "must determine whether other forms of relief sought by the SEC are penalties subject to Section 2462," 783 F. Supp. 2d 867, 883 (N.D. Tex. 2011), and concluded that injunctive relief and officer-and-director bars were "properly construed as penalties as a matter of law," given the "significant collateral consequences to" the defendants, *id.* at 885.

Determining whether proposed remedies are penalties subject to § 2462 requires a "fact-intensive inquiry." *Id.* at 884 (citing *SEC v. Alexander*, 248 F.R.D. 108, 115-16 (E.D.N.Y. 2007)). A penalty "is a form of punishment . . . which goes beyond remedying the damage caused to the harmed parties by the defendant's action." *Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996). The D.C. Circuit has explained that the test of whether a remedy is a penalty is "not measured from the subjective perspective of the accused (which would render virtually every sanction a penalty)," but that "the degree and extent of the consequences to the subject of the sanction must be considered as a relevant factor in determining whether the sanction is a penalty." *Id.*

A number of courts have determined that injunctions that prevent a defendant from working in her profession are penalties, but that disgorgement of ill-gotten gains is not a penalty. *See, e.g.*, *Microtune*, 783 F. Supp. 2d at 888 (concluding that disgorgement of some kinds of profits is not a penalty); *SEC v. DiBella*, 409 F. Supp. 2d 122, 127-28, 128 n.3 (D. Conn. 2006) (finding that a permanent injunction and officer-and-director bar were penalties but that disgorgement was not). Other courts have concluded that an injunction may not be a penalty if the agency can establish a likelihood that the illegal conduct will recur. *See, e.g.*, *SEC v. Wyly*, 2013 WL 2450545, at *6 (S.D.N.Y. June 6, 2013) ("Given the allegations against [defendant], which involve conduct over an extended period, at different institutions, and include an insider trading claim, it would be premature to find that injunctive relief is not warranted.").

In this case, the court cannot determine which types of relief should be considered penalties based on the facts at hand. Thus, engaging with the parties' argle-bargle as to what constitutes a civil penalty is premature. The court has little basis on which to assess Reisinger's scienter, the egregiousness of her actions, and the likelihood that she might commit violations of the Act in the future. *See, e.g.*, *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) (listing factors to be evaluated in determining appropriateness of permanent injunction). Therefore, although the court holds that the CFTC may not seek  civil penalties for violations that occurred before June 29, 2006, the court denies Reisinger's motion for summary judgment insofar as it argues that *all* of the CFTC's claims constitute civil penalties barred by the statute of limitations.

## B.  Counts I-III (Fraud in Connection with Commodity Transactions)

Counts I-III allege violations of various sections of the Act and regulations that are all based on fraud or deceit by a CPO. In Count I, the CFTC alleges that Reisinger violated 7 U.S.C. §§ 6b(a)(2)(i) and (iii). Those sections state:

It shall be unlawful . . . (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity . . . for or on behalf of any other person . . . (i) to cheat or defraud or attempt to cheat or defraud such other person; . . . [or] (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract . . . .

7 U.S.C. §§ 6b(a)(2)(i) and (iii).

In Count II, the CFTC alleges violations of 7 U.S.C. § 6c(b) and CFTC regulations 33.10(a) and (c), 17 C.F.R. § 33.10(a) and (c). Section § 6c(b) states that transactions involving commodities must be conducted in compliance with the CFTC's regulations.[7] The regulations referenced in the complaint essentially restate 7 U.S.C. §§ 6b(a)(2)(i) and (iii):

It shall be unlawful for any person directly or indirectly:

(a) To cheat or defraud or attempt to cheat or defraud any other person;
. . .
(c) To deceive or attempt to deceive any other person by any means whatsoever

in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10(a) and (c).

In Count III, the CFTC alleges that Reisinger violated 7 U.S.C. § 6o(1)(B), which states:

(1) It shall be unlawful for a . . . commodity pool operator, . . . , by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--
. . .

---

[7] The section states:

(b) Regulated option trading

No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter . . . contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

7 U.S.C. § 6c(b) (2000).

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1)(B).

The bases for the alleged violations in the first three counts are identical. The CFTC claims that Reisinger made the following material misrepresentations to participants and potential participants in the pool:

- that she was exempt from the requirement to register as a CPO;
- that only QEPs would participate in the pool;
- that the minimum investment required to participate in the pool was $5 million;

The CFTC further alleges that Reisinger made material omissions by failing to advise participants that:

- neither she nor ROF were registered as CPOs as required by the Act and were operating the pool without the required CPO registration;
- her notice of exemption from the requirement to register as a CPO was invalid;
- she failed to amend the invalid notice of exemption as required by CFTC Regulation 4.13(b)(4);
- payments were made to a "foreign introducing broker."

In support of these alleged violations, the CFTC argues that Reisinger made false statements in the questionnaires, and that she had a duty to correct misrepresentations made to pool participants when she knew they were untrue.

Reisinger first argues that the CFTC cannot demonstrate the she made the statements in question, and that the questionnaires are not authenticated exhibits. The two questionnaires identified by the CFTC stated that the pool was open to "Accredited Investors who are also Qualified Purchasers," and that "[t]he minimum investment required per entity is $5,000,000 USD." Although Reisinger argues that she did not make these statements, one of the questionnaires bears her stamped signature, which, in the court's view, supports the inference

that Reisinger made the statements.  This inference is further supported by her testimony that she was the CEO of NCCN.  As to Reisinger's argument that the court should not rely on the exhibits because they are unauthenticated, it is true that "[a] court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citing *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible hearsay evidence will not overcome a motion for summary judgment)).  But although the CFTC has not established sufficient foundation for the exhibit at this time, it is likely that it can do so at trial.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial).

Section 6b(a)(2) "is meant to impose upon all persons holding membership or trading privileges" in a commodity market "a duty of full and truthful disclosure to their commodity customers of any and all pertinent investment information."  *CFTC v. Schafer*, No. Civ. A. H–96–1213, 1997 WL 33547409, at *4 (S.D. Tex. Dec. 23, 1997) (citing *Kearney v. Prudential–Bache Sec., Inc.*, 701 F. Supp. 416, 423 (S.D.N.Y. 1988)).  As a number of circuit courts have acknowledged, the elements of a fraud claim under 7 U.S.C § 6b are derived from the common-law action for fraud.  *See, e.g.*, *Puckett v Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1018 (5th Cir. 1990).  Thus, the CFTC must prove that the omission or misrepresentation was one of material fact regarding a commodity futures transaction.  *See, e.g.*, *Saxe v. E.F. Hutton, Co.*, Inc., 789 F.2d 105, 111 (2d Cir. 1986) (explaining that materiality requirement requires that the alleged misstatements be important "to a reasonable investor").  Second, the defendant must have made the statements knowing that material facts were falsely represented or omitted.  *See, e.g.*, *CFTC v. Savage*, 611 F.2d 270, 283 (9th Cir. 1979) (requiring proof of scienter).  Most

circuits have held that knowledge can be established by demonstrating that the defendant knew the statement was false at the time it was made or that the statement was made with reckless disregard to its truth or falsity. *See, e.g.*, *Wasnick v. Refco Inc.*, 911 F.2d 345, 348 (9th Cir. 1990) (misrepresentation must have been made intentionally or with careless disregard). "Mere negligence, mistake, or inadvertence fails to meet [the] scienter requirement." *Id.* at 348 (citing *Drexel, Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988)). Third, the CFTC must prove that the misrepresentation was made with the intent to induce reliance. *See Puckett*, 903 F.2d at 1018 (relying on elements of common-law fraud).

The requirements for a claim under 7 U.S.C. § 6*o*(1)(B) are essentially the same as those of a § 6b claim. *Schafer*, 1997 WL 33547409, at *8. The language of the latter section, however, is broader; it encompasses fraud against a "prospective client," rather than simply fraud "in connection with" a contract for sale of a commodity.

Construing the facts in the light most favorable to the CFTC, the court concludes that a reasonable fact-finder could conclude that the statements in the questionnaires were untrue, that they constituted an attempt to defraud or deceive, 7 U.S.C § 6b(a)(2)(i), and that they "operate[d] as a fraud or deceit upon . . . prospective client[s]," 7 U.S.C. § 6*o*(1)(B). This is because the evidence supports the inference that Reisinger did not actually verify whether the pool participants were QEPs and knew, at the time the statements were made, that she would not do so. The pool also imposed no minimum investment requirement on participants. Construing all facts in favor of the CFTC, the statements were made with reckless disregard of their truth. They could also be viewed by a reasonable fact-finder as material to a pool participant's decision to invest, because they bore on the exempt nature of the pool and the total assets the pool would have available to it for investment.

Reisinger argues that no pool participant could have been defrauded by the representation that the pool was open only to investments of $5 million or more, as they were themselves allowed to invest less. But whether the statements operated as a deceit on investors is a factual issue inappropriate for resolution on summary judgment. Moreover, the Seventh Circuit has suggested that the CFTC need not prove actual reliance on a misrepresentation in support of a claim pursuant to 7 U.S.C. § 6b(a)(2), because the statute proscribes even attempts at fraud. The court reasoned in *Slusser v. CFTC*, 210 F.3d 783, 786 (7th Cir. 2000), that because the statute "makes it actionable 'to cheat *or defraud or attempt to cheat or defraud* such other person' (emphasis added)," it may be "unnecessary to show reliance . . . for an attempt that fails (perhaps because no one relied on it) is nonetheless a violation." The court therefore denies Reisinger's motion for summary judgment as Counts I-III.

Reisinger further argues that any claims based on the questionnaires are barred by the statute of limitations. Although the court will not dismiss Counts I-III, the court agrees that, for the reasons explained above, civil penalties based on the statements in the questionnaires themselves are time-barred because the alleged misrepresentations fall outside of the limitations period. The allegations of fraud or deceit in Counts I and II therefore cannot form a basis for civil penalties. The CFTC, however, may seek other remedies for these alleged violations that do not constitute civil penalties.

In contrast to Counts I and II, Count III, which alleges violations of 7 U.S.C. § 6*o*(1)(B), may support a claim for civil penalties. The CFTC argues that the alleged violations continued during the limitations period because Reisinger had a duty to correct misrepresentations made to pool participants when she realized that they were untrue, and the pool continued to operate after June 29, 2006. It grounds this argument on the fiduciary obligations it claims are owed by CPOs

to pool participants. Some courts have read 7 U.S.C. § 6*o*(1)(B)—which prohibits "any . . . course of business which operates as a fraud or deceit upon any client or participant"—to mean that certain commodity professionals required to register under the Act have a fiduciary relationship with pool participants. *See, e.g.*, *CFTC v. Savage*, 611 F.2d 270, 285 (9th Cir. 1980) (The purpose of § 6*o*(1) is to "implement[ ] the fiduciary capacity that characterizes the advisor's relationship to his clients."); *Schafer*, 1997 WL 33547409, at *8.

Although an omission is actionable only when the party has a duty to disclose the omitted facts, a fiduciary relationship includes a duty of candor. *Michael v. FDIC*, 687 F.3d 337, 351 (7th Cir. 2012). The CFTC has pointed to no cases that directly address whether a CPO has a fiduciary duty to correct misleading statements made to pool participants, but the Seventh Circuit has held that a broker may be a fiduciary of his customers when he exercises discretion over their investments. *United States v. Dial*, 757 F.2d 163, 168 (7th Cir. 1985); *CFTC v. Heritage Capital Advisory Servs.*, 823 F.2d 171, 173 (7th Cir. 1987) ("Courts have recognized a fiduciary duty between a commodities broker and its client."); *see also Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, (7th Cir. 1996) (noting that in securities law context, "[t]he general rule . . . is that a broker is not the fiduciary of his customer unless the customer entrusts him with discretion to select the customer's investments").

These cases suggest that the existence of a fiduciary relationship between a CPO and pool participants is a factual question that depends on whether the CPO managed the investors' funds. Here, Reisinger testified that she "was the broker that picked the traders" and allocated funds to the traders. Based on these facts and drawing inferences in favor of the CFTC, the court concludes that Reisinger may have had a fiduciary relationship with pool participants, and may thus have had a duty under 7 U.S.C. § 6*o*(1) to correct false statements made to pool participants.

Therefore, if it proves Reisinger's liability, the CFTC may be entitled seek civil penalties against her based on the violations of 7 U.S.C. § 6*o*(1) alleged in Count III.

The CFTC also argues that, in addition to the misrepresentations in the questionnaires, Reisinger made numerous material omissions involving CPO registration requirements under the Act and the materials that registered CPOs are required to provide to pool participants. These requirements are better understood as violations of CFTC regulations rather than as instances of fraud actionable under 7 U.S.C. §§ 6b(a)(2) and 6*o*(1)(B). The court therefore addresses them below with respect to Counts IV-VI.

## C. Count IV (Failure to Register as a CPO)

In Count IV, the CFTC alleges that Reisinger violated 7 U.S.C. § 6m(1), which provides:

> It shall be unlawful for any . . . commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as [a] . . . commodity pool operator[.]

7 U.S.C. § 6m(1) (2000). The CFTC alleges that Reisinger was neither registered as a CPO under the Act nor entitled to a valid exemption from the requirement to register as a CPO.

As noted above, CFTC regulation § 4.13 allows a CPO to claim an exemption from registration if

> (i) Interests in the pool are exempt from registration under the Securities Act of 1933, and such interests are offered and sold without marketing to the public in the United States; [and]
>
> (ii) The [CPO] reasonably believes, at the time of investment . . . that:
>
> > (A) Each natural person participant . . . is a 'qualified eligible person,' as that term is defined in § 4.7(a)(2); and
> >
> > (B) Each non-natural person participant is a 'qualified eligible person,' as that term is defined in § 4.7, or an 'accredited investor'."

§ 4.13(a)(4).  Reisinger filed a notice of exemption on this basis.  The CFTC claims that she was not entitled to such an exemption. The CFTC contends that, prior to filing the notice of exemption with the NFA, Reisinger failed to adequately inform herself as to whether NCCN pool participants were actually QEPs.

Construing the facts in favor of the CFTC, the court agrees that Reisinger's belief that each pool participant was a QEP was not reasonable.  For example, with regard to Caffray, Reisinger testified that Caffray qualified as a QEP based on his net worth as a natural person, based on paperwork he filled out "when he started at Merrill Lynch and Morgan Keegan." (Reisinger Dep. 40:7-15.)  But she did not verify where the money came from that was in the Caffray Account at Bank of America.  She testified that she didn't "know how much of [the money in the Caffray Account] was Australian and how much was U.S. or who that belonged to." (*Id.* at 24:15-18.)  She also stated that she did not know whether Caffray invested any of his own money in NCCN.  (*Id.* at 49:4-8.)  On these facts, Reisinger could not have had a reasonable belief that every participant in the pool was a QEP because the funds channeled into the pool through the Caffray Account were of unknown provenance.  Although Reisinger contends that she considered Caffray to be her client, she cannot skirt the registration requirement by relying on the status of a person who acted as a conduit for the funds of the actual pool participants.  The facts support the inference that the Caffray Account was set up to facilitate the transmission of funds by the investors into the pool, and that Reisinger was involved in the process by which funds were wired in a multi-step process, first into the Caffray Account and then eventually into the pool.  The court concludes that, on these facts, Reisinger cannot establish for purposes of the motion for summary judgment that she was entitled to an exemption from CPO registration.  The court therefore denies Reisinger's motion for summary judgment as to Count IV.

**D.   Count V (Failure to File Exemption Notice Prior to Delivery of Subscription Agreements, Make Disclosures to Investors, and Amend Invalid Notice)**

In Count V, the CFTC alleges that Reisinger violated several CFTC regulations.  The CFTC first argues that Reisinger's Notice of Exemption was invalid because she filed it with the NFA subsequent to the time she delivered subscription agreements for the NCCN pool to prospective pool participants, in violation of CFTC regulation § 4.13(b)(2), which states:

> (2) The person must file the notice by no later than the time it delivers a subscription agreement for the pool to a prospective participant in the pool[.]

17 C.F.R. § 4.13(b)(2).  The court agrees that Reisinger failed to comply with this regulation.  The facts show that Client Services Agreements were delivered to prospective pool participants before March 8, 2005, but that the Notice of Exemption was filed no sooner than May 2005.  The violation occurred outside of the statute-of-limitations period and cannot support a claim for civil penalties, but it may support claims for other relief, as discussed above.

The CFTC next argues that Reisinger was not eligible for her claimed exemption because she failed to provide all participants in the pool with the written statements required pursuant to CFTC regulation § 4.13(a)(5), which states:

> (5)(i) Eligibility for exemption under this section is subject to the person furnishing in writing to each prospective participant in the pool:
>
> (A) A statement that the person is exempt from registration with the Commission as a commodity pool operator and that therefore, unlike a registered commodity pool operator, it is not required to deliver a Disclosure Document and a certified annual report to participants in the pool; and
>
> (B) A description of the criteria pursuant to which it qualifies for such exemption from registration.
>
> (ii) The person must make these disclosures by no later than the time it delivers a subscription agreement for the pool to a prospective participant in the pool.

17 C.F.R. § 4.13.  Nothing in the facts suggests that Reisinger provided these statements to pool participants.  Again, however, this violation occurred outside of the limitations period for civil penalties.

Finally, according to the CFTC, Reisinger failed to amend her Notice of Exemption from the requirement to register as CPO of the NCCN pool within fifteen days of an event making an amendment mandatory, in violation of CFTC regulation § 4.13(b)(4). That regulation states:

> (4) Each person who has filed a notice of exemption from registration under this section must, in the event that any of the information contained or representations made in the notice becomes inaccurate or incomplete, file a supplemental notice with the National Futures Association to that effect which, if applicable, includes such amendments as may be necessary to render the notice accurate and complete. This supplemental notice must be filed within 15 business days after the pool operator becomes aware of the occurrence of such event.

17 C.F.R. § 4.13(b)(4).  The CFTC argues that Reisinger violated § 4.13(b)(4) when she failed to amend her Notice of Exemption after learning of potential non-QEP investors who were wiring funds into the pool through the Caffray Account.

Reisinger responds that she was not required to amend the notice because the pool participants were all QEPs.  And indeed, the facts suggest that the CFTC has not identified any non-QEPs who participated in the pool.  But regulation § 4.13(b)(4) states that a supplemental notice is required when the CPO becomes aware "that any of the information contained or representations made in the notice becomes inaccurate."  Reisinger's Notice of Exemption contained the statement

> I reasonably believe, at the time of investment, [e]ach natural person[] participant is a 'qualified eligible person,' as that term is define[d] in 4.7(a)(2) and . . . [e]ach Non-natural person participant is a 'qualified eligible person,' as that term is defined in 4.7, or a[n] 'accredited investor.' as the term is defined in 230.501(a)(i)-(3)(a)(7) and (a)(8).

(Exemption Claim.)

Construing the facts in favor of the CFTC, Reisinger became aware while the pool was operating that this statement was false. Her belief that each pool participant was a QEP was not reasonable because she did not know—or attempt to find out—who the pool participants actually were. She testified that that she didn't "know how much of [the money in the Caffray Account] was Australian and how much was U.S. or who that belonged to." (Reisinger Dep. 24:15-18.) The facts also indicate that, after receiving communications from Caffray's investors in 2006, Reisinger concluded that Caffray was collecting funds from third parties and depositing them into the NCCN pool, and that this information concerned Reisinger because she realized that the actual source of the funds might not be a QEP. She had documentation supporting the QEP status of only one of Caffray's clients. (*Id*. at 54:10-22.) In 2007, her conversations with the Cassidys led her to conclude that they were not QEPs. (Reisinger Dep. II 758:1 - 759:13.) When Reisinger became aware that the statement in the Notice of Exemption was inaccurate, she was required under the CFTC regulations to file a supplemental notice. Nonetheless, the pool continued operating until October 26, 2009, and Reisinger did not amend her Notice of Exemption. By failing to do so, she may have violated § 4.13(b)(4).

For the reasons discussed above, the court concludes that, construing all facts in favor of the CFTC, questions of disputed fact require the court to deny Reisinger's motion for summary judgment as to Count V. Reisinger may have violated several CFTC regulations requiring the Exemption Notice to be filed before the delivery of subscription agreements, disclosures of her exempt status to be made to investors, and a supplemental Notice of Exemption to be filed.

## D. Count VI (Failure to Provide Reports and Statements to Investors)

Count VI alleges that Reisinger violated 7 U.S.C. § 6n(4) and CFTC regulation § 4.22. Section 6n(4) states:

> (4) Every commodity pool operator shall regularly furnish statements of account to each participant in his operations. Such statements shall be in such form and manner as may be prescribed by the Commission and shall include complete information as to the current status of all trading accounts in which such participant has an interest.

7 U.S.C. § 6n(4).  The CFTC regulations state, in relevant part:

> (a) . . . each commodity pool operator registered or *required to be registered* under the Act must periodically distribute to each participant in each pool that it operates, . . . an Account Statement, which shall be presented in the form of a Statement of Income (Loss) and a Statement of Changes in Net Asset Value, for the prescribed period. . . .

17 C.F.R. § 4.22 (emphasis added).  The regulations require that, in the Account Statements, the CPO itemize brokerage commissions and fees, "material business dealings" not previously disclosed, and total assets, withdrawals, additions, income and losses.  *Id.*

The CFTC alleges that Reisinger failed to provide pool participants with the statutorily prescribed annual reports and account statements throughout the relevant period.  Reisinger claims that she was not required to provide the reports and statements because her Notice of Exemption was valid, and that under the regulations, a person exempt from registration is not required to provide the annual reports and account statements.

The CFTC regulations refer to each commodity pool operator registered or *required to be registered* under the Act.  For the reasons discussed above, the court concludes that, construing all facts in favor of the CFTC, Reisinger was required to be registered under the Act as a CPO because she did not meet the requirements to file a Notice of Exemption.  Therefore, she was required to distribute the reports and statements mandated by 7 U.S.C. § 6n(4) and 17 C.F.R. § 4.22.  She did not do so, and the court therefore denies her motion for summary judgment as to Count VI of the complaint.

# IV. CONCLUSION

For the reasons discussed above, Reisinger's motion for summary judgment is granted in part and denied in part. The motion for summary judgment is denied insofar as Reisinger seeks dismissal of all counts of the complaint. The CFTC is barred by the statute of limitations from seeking civil penalties for the violations alleged in Counts I and II, which are premised on conduct occurring prior to June 29, 2006. It may, however, seek other forms of relief against Reisinger for violations that occurred before that date. Civil penalties may be available for any violations of the Act committed after June 29, 2006, including violations committed by Reisinger while continuing to operate the pool after that date. Thus, as explained herein, the CFTC may seek civil penalties for violations alleged in Counts III-VI.

ENTER:

_____/s/_____

JOAN B. GOTTSCHALL
United States District Judge

DATED: July 18, 2013