**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| U.S. Commodity Futures Trading Commission, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 11 C 8567 |
| Grace Elizabeth Reisinger and ROF Consulting, LLC, | ) ) ) ) | Judge Joan B. Gottschall |
| Defendants. | ) ) ) | |

**REISINGER'S LOCAL RULE 56.1 RESPONSE TO PLAINTIFF'S STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF THE MOTION FOR SUMMARY
<u>JUDGMENT AND ADDITIONAL MATERIAL FACTS</u>**

Defendant Reisinger hereby responds, pursuant to Local Rule 56.1, to plaintiff's

statement of undisputed material facts, and states her additional material facts, as follows:

A.    <u>Response to Plaintiff's Statement of Undisputed Material Facts</u>

1.    Plaintiff U.S. Commodity Futures Trading Commission ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Commodity Exchange Act ("Act") as amended, 7 U.S.C. §§ 1 *et seq.* (2006 and Supp. V 2011) and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2012).  Defendant Reisinger's Answer to Complaint ("Answer") 4, ECF No. 40; Memorandum Opinion and Order ("Order"), 2, ECF No. 67.

Response: Undisputed.

2.    Defendant Grace Elizabeth Reisinger ("Reisinger") is an individual residing in Grand Island, Nebraska. From at least February 28, 2005 to October 26, 2009 (the "relevant period"), Reisinger was registered with the Commission as an associated person ("AP") of New World Holdings, LLC and acted as its branch manager.  Complaint 6, ¶ 17, ECF No. 1; Answer 4, ECF No. 40.

Response: Undisputed.

3.      During the relevant period, Reisinger was also listed as the operator of the NCCN LLC pool in the records of the National Futures Association ("NFA").  Exhibit 1, Certified Records of NFA.

Response: The existence of the NFA record is undisputed but the fact is disputed.  The exemption claim submitted by Reisinger to NFA listed her as CEO, not CPO, and she denies being the CPO of NCCN.  The CPO designation was made by NFA, not by Reisinger.  Tab A – Reisinger Decl., ¶ 20.; Tab B-Spight Dep. Excerpts p. 5, l. 8-p. 5, l. 15.[1]

4.      Defendant ROF Consulting, LLC ("ROF") was a limited liability corporation organized and managed under the laws of Alaska on May 2, 2003.  ROF was dissolved on or about February 2, 2009.  ROF has never been registered with the Commission in any capacity.  Answer 5, ECF No. 40; Exhibit 2, Certified Records of State of Alaska, Department of Community and Economic Development, Division of Banking , Securities and Corporations, Certificate of Organization of ROF Consulting, LLC ("ROF Alaska Records"), CFTC-LAM-0000109, CFTC-LAM-0000111.

Response: Undisputed.

5.      During the relevant period, ROF was jointly managed and equally owned by its four members: Reisinger, James E. Green ("Green"), Larry Alan Matthews ("Matthews") and Nancy Belle Vinson Dadey ("Dadey').  Exhibit 2, ROF Alaska Records, CFTC-LAM-0000109, CFTC-LAM-0000111.

Response: Undisputed except that the time period is disputed, because ROF did not exist during part of the relevant period, as it was dissolved on or about February 2, 2009.  Pl. Facts, ¶ 4.

6.      NCCN, LLC ("NCCN") was a limited liability corporation organized under the laws of the State of Nevada on or around October 14, 2004.  ROF is identified as NCCN's sole managing member in NCCN's corporate formation documents.  NCCN was dissolved on or around October 31, 2009. Exhibit 3, Certified Records of Nevada Secretary of State regarding NCCN LLC ("NCCN Nevada Records).

---

[1] References to the record are as follows:  Pl. Facts – Plaintiff's Statement of Material Facts; Pl. Ex. – Plaintiff's Exhibit in Appendix to Plaintiff's Statement of Material Facts; Tab A – Reisinger Decl. – Declaration of Grace Elizabeth Reisinger; Tab B – Spight Dep. Excerpts – Excerpts from the Deposition of Michelle Spight; Tab C – Pendleton Dep.  – Deposition of Sharon Pendleton; Tab D – NFA Ex. 1 – NFA Exhibit 1 from Depositions of Michelle Spight and Sharon Pendleton.

Response: Undisputed.

7.     NCCN has never been registered with the Commission in any capacity.  Answer, 5, ECF No. 40.

Response: Undisputed.

8.     Cadent Financial Services LLC ("Cadent") was a registered futures commission merchant ("FCM"), with its principal place of business located in Chicago, Illinois.  Complaint, ¶ 46.

Response: Undisputed.

9.     Donald Brinkman Caffray ("Caffray") is a U.S. citizen residing in Long Beach, California.  Caffray is a member of the California bar.  Caffray has never been registered with the Commission in any capacity.  Order, 7, ECF No. 67.

Response: Undisputed.

10.    James E. Green is an individual residing in San Diego, California.  Green was a member of ROF during the relevant period.  Green has never been registered with the Commission in any capacity.  Complaint, 7, ECF No. 1; Answer 6, ECF No. 40.

Response: First sentence is disputed, because Reisinger believes that Green resides in

Panama.  Second sentence is undisputed as to Green being a member of ROF, but time period is

disputed because ROF was dissolved on or about February 2, 2009 and therefore did not exist

during part of the relevant period.  Third sentence is undisputed.  Tab A – Reisinger Decl., ¶ 2;

Pl. Facts, ¶ 4.

11.    Larry Alan Matthews is an individual residing in Winnsboro, South Carolina, who was a member of ROF during the relevant period.  During the relevant period, Matthews was registered as an AP and listed as a Principal of Sondial Timepeace LLC.  Exhibit 11, Matthews deposition testimony, December 6, 2012, 7:8-9; 13: 13-15.

Response: First sentence is undisputed as to Matthews residing in Winnsboro, South

Carolina and being a member of ROF, but time period is disputed because ROF was dissolved on

or about February 2, 2009 and therefore did not exist during part of the relevant period.  Second

sentence is undisputed as to Matthews being registered as an AP and listed as a principal of

Sondial Timepeace, but disputed as to the time period, because Matthews was not registered as

an AP or listed as a principal of Sondial Timepeace, LLC for part of the relevant period. Pl.

Facts, ¶ 4; Tab A – Reisinger Decl., ¶ 28.

12.     Nancy Belle Vinson Dadey is defendant Reisinger's deceased mother and was a member
of ROF during the relevant period. Exhibit 8, Reisinger testimony, January 25, 2012, 91: 5-6;
Exhibit 11, Matthews deposition testimony, December 6, 2012, 16:10-24; 17: 1-2.

        Response: Undisputed that Nancy Belle Vinson Dadey was Reisinger's deceased mother

and a member of ROF, but time period is disputed, because Ms. Dadey passed away in

December 2008. Tab A – Reisinger Decl., ¶ 2.

13.     Tokaikolo Christian Church is a church located in Nuku'alofa, in the Kingdom of Tonga.
The Tokaikolo Christian Church was a participant in the NCCN pool, beginning on or about
October 4, 2004. The Tokaikolo Christian Church wired a total of $249,918.91 to Reisinger and
ROF, through Caffray, for deposit in the NCCN pool's commodity account at Cadent. Exhibit
16, Declaration of Limoni Oto Naulu and attached documents.

        Response: The first sentence is undisputed in that Tokaikolo Christian Church purports to

be a church located in Nuku'alofa, Kingdom of Tonga, but Tokaikolo Christian Church also

acted as a solicitor of funds for investments. Second sentence is disputed, because Tokaikolo

Christian Church was not a participant in the NCCN pool at any time. In addition, Reisinger did

not receive any funds from Caffray or from the Tokaikolo Christian Church. Caffray sent funds

to an account in the name of the Donald Caffray Attorney Trust Account at Morgan Keegan,

from which he caused them to be transferred to NCCN account at Morgan Keegan when he

wanted to participate in an NCCN investment. Caffray also sent funds from the Donald Caffray

Attorney Trust Account to ROF, where those funds were controlled by Matthews, who caused

them to be transferred to the NCCN account at Cadent. Tab A – Reisinger Decl., ¶s 6, 12, 13.

14.    No later than February 28, 2005, Reisinger and ROF began soliciting actual and prospective pool participants to participate in the NCCN LLC pool for the purpose of trading in commodities for future delivery subject to the rules of any contract market.  Exhibit 14, Declaration of Donald B. Caffray and attached document ("Caffray Declaration").

Response:  Disputed.  Reisinger and ROF did not begin soliciting actual and prospective

pool participants to participate in the NCCN, LLC pool for the purpose of trading in

commodities for future delivery subject to the rules of any contract market no later than February

28, 2005.  The initial solicitation for funds to be managed by NCCN, including any solicitation

on or about February 28, 2005, was for a bond trading program at Merrill Lynch and Morgan

Keegan, and not for a commodity pool.  Tab A – Reisinger Decl. ¶s 4, 5, 8.

15.    Reisinger solicited Donald B. Caffray ("Caffray") on February 28, 2005, when she sent him a "Prospective Client Questionnaire" on NCCN LLC letterhead.  *Id.*

Response: Disputed.  Reisinger did not solicit Caffray or the Donald Caffray Attorney

Trust Account.  Any solicitation of Caffray was done by Lynn Caswell and/or Alan Matthews.

In addition, the Prospective Client Questionnaire was not a solicitation of an investment, but

rather sought to qualify investors prior to solicitation for a bond trading program at Merrill

Lynch and Morgan Keegan.  Also, Reisinger did not send Caffray a Prospective Client

Questionnaire on February 28, 2005 or at any other time.  Reisinger believes that the Prospective

Client Questionnaire was sent to Caffray by Nancy Dadey without the knowledge of Reisinger,

and that Nancy Dadey affixed a stamp of Reisinger's signature to the Prospective Client

Questionnaire before sending to Caffray.  Tab A – Reisinger Decl. ¶s 5, 10; Pl. Ex. 14.

16.    The "Prospective Client Questionnaire" on NCCN LLC letterhead, stated in pertinent part:

Greetings.  It is our understanding that you have expressed an interest in placing funds for management with NCCN, LLC, which is open to Accredited Investors who are also Qualified Purchasers as defined in Section 2(a)(51) of the United States Investment Company Act.  The minimum investment required per entity is $5,000,000 USD.  Even though you may not be a

U.S. citizen, we use U.S. Accredited Investor and Qualified Purchaser criteria for qualification purposes for all investors.

Exhibit 15, "Prospective Client Questionnaire." Exhibit 14, Declaration of Donald B. Caffray authenticating "Prospective Client Questionnaire.".

Response: Undisputed that this is an accurate quotation from the cover page for the

Prospective Client Questionnaire. Disputed that this is the Questionnaire itself or that it is the

pertinent part of the Questionnaire. Pl. Ex. 14.

17.     Caffray authenticated the "Prospective Client Questionnaire" in the September 17, 2013 declaration he provided the Commission. *Id.*

Response: Undisputed that Caffray made statements concerning the Prospective Client

Questionnaire in his September 17, 2013 declaration, but the facts he stated are disputed.

Reisinger did not send the Questionnaire to Caffray, and Caffray's statement that the

Questionnaire was sent in connection with a commodity pool is not true, because the Prospective

Client Questionnaire was sent in connection with a bond trading program at Merrill Lynch and

Morgan Keegan. In addition, Caffray testified in his declaration only regarding a cover sheet for

the Questionnaire, and not the Questionnaire itself. Tab A – Reisinger Decl. ¶s 4, 5, 8; Pl. Ex.

14.

18.     Matthews authenticated the "Accredited Investor Questionnaire" completed by Secured Bond, Ltd. and GP Global, Ltd. on September 21, 2005. Exhibit 18, Declaration of Larry Alan Matthews and authenticated documents, CFTC-IDY-024193.0001 -024193.0002.

Response: Disputed. Matthews stated that he located these documents after a thorough

search. He made the conclusory statement that he "authenticates the materials" he located, but

he did not provide sufficient foundation testimony to authenticate this document. Pl. Ex. 18.

19.     In the "Prospective Client Questionnaire," Reisinger made a number of representations to prospective participants in the NCCN LLC pool, beginning with the representation that NCCN

LLC is open only to "accredited investors who are also qualified purchasers." Exhibit 15, "Prospective Client Questionnaire."

Response: Disputed. The Prospective Client Questionnaire was not prepared by Reisinger but rather was prepared by Lynn Caswell or someone acting on his behalf. Reisinger also did not distribute the Prospective Client Questionnaire or authorize its distribution. In addition, the Prospective Client Questionnaire was not referring to the NCCN LLC pool, because the NCCN LLC pool did not exist at the time the Questionnaire was sent, and the Questionnaire was referring to a bond trading program at Merrill Lynch and Morgan Keegan whereby NCCN would act as manager. Tab A – Reisinger Decl. ¶s 4, 5, 8, 10.

20.     Reisinger further represented that the "minimum investment required per entity is "$5,000,000 USD." *Id*. The aggregate of all funds deposited into the NCCN LLC by all participants did not total $5,000,000. Exhibit 17, Declaration of George Malas, ¶24(c).

Response: Disputed. The Questionnaire cover page states that the minimum required investment was $5,000,000, but Reisinger did not make this representation. In addition, under the Client Services Agreement signed by each NCCN investor, this requirement was subject to waiver. Also, it was Matthews who decided whether to accept funds of less than $5,000,000 to be managed by NCCN. It is undisputed that the total funds deposited into the NCCN pool was not $5,000,000, but this was not the only investment made by NCCN, so that it is not indicative of the amount of funds invested in NCCN. Tab A – Reisinger Decl. ¶s 11, 12, 29.

21.     Reisinger omits any mention of her registration status, and does not advise prospective participants that she is acting as an unregistered CPO. *Id*.

Response: Disputed. Reisinger did not draft the Prospective Client Questionnaire or send it to Caffray or to anyone else. Also, neither ROF nor Reisinger was acting as an unregistered CPO on the date of the Questionnaire, because it was for a bond trading program at Merrill Lynch and Morgan Keegan. Tab A – Reisinger Decl. ¶s 4, 8, 10.

22.     Between February 28, 2005 and June 24, 2005, Reisinger and ROF accepted funds from pool participants for the purpose of trading in commodities for future delivery and options thereon, pooled said funds in the NCCN LLC commodity trading account at the futures commission merchant ("FCM") Cadent Financial, LLC ("Cadent"), and ultimately traded the funds on behalf of pool participants.  Exhibit 9, Certified Copy of Reisinger January 26, 2010 testimony excerpts, 467:1-18; 491:18-24; 492:1-5.

    Response: Disputed.  Reisinger never accepted any funds from any pool participants.

Beginning on May 18, 2005, and containing through January 30, 2008, funds in the NCCN

commodity account were traded by professional trading advisors, chosen by Reisinger who was

acting on behalf of ROF and NCCN.  Beginning on May 6, 2005, some investors in NCCN

authorized funds held by them at Morgan Keegan to be sent to the NCCN account at Morgan

Keegan, from which they were sent to the NCCN account at Cadent, and some investors later

directed funds to ROF for transfer by Matthews to the NCCN account at Cadent.  Tab A –

Reisinger Decl. ¶s 6, 7, 27.


23.     Between February 28, 2005 through June 24, 2005, Reisinger and ROF were neither registered with the Commission as CPOs, nor did either possess an exemption from the requirement to register as CPOs.  Exhibit 1, Certified Records of the National Futures Association for Grace Elizabeth Reisinger and NCCN LLC.

    Response: Disputed.  On May 5, 2005, Reisinger, on behalf of ROF, filed a claim for an

exemption from CPO registration with respect to the NCCN pool, and this exemption was in

proper form.  Tab A – Reisinger Decl. ¶ 19; Tab B – Spight Dep. Excerpts, p. 15, l. 24 – p. 16, l.

9.


24.     On June 24, 2005, Reisinger filed her CPO Exemption Letter with the NFA, which stamped it "Received, NFA Compliance, June 24, 2005."  Exhibit 5, Certified Copy of Michelle Spight's September 13, 2012 testimony excerpts, 29: 1-16.

    Response: Disputed.  Reisinger filed the CPO exemption claim, as CEO of NCCN, on

May 5, 2005 by faxing it and sending a hard copy by mail or federal express to NFA.

Undisputed that NFA, by a person whose identity is unknown, on a date that cannot be

established with certainty because there is no one with personal knowledge to testify when it was stamped, stamped the form: "Received, NFA Compliance, June 24, 2005." Tab A – Reisinger Decl. ¶ 19; Tab B – Spight Dep. Excerpts, p. 7, l. 21-23; Tab C – Pendleton Dep., p. 5, l. 21-24; Tab D-NFA Ex. 1.

25.     Reisinger's CPO Exemption Letter, dated May 5, 2005, identified NCCN LLC as the pool, and herself as the operator of the NCCN LLC pool. Exhibit 4, Certified Copy of Reisinger's CPO Exemption Letter.

Response: Disputed. The exemption claim, as filed by Reisinger, identified Reisinger as CEO, by which she meant CEO of NCCN. NFA added the CPO Designation. Undisputed that the May 5, 2005 exemption claim identified NCCN, LLC as the exempt pool. Tab A – Reisinger Decl. ¶ 20.; Tab B-Spight Dep. Excerpts, p. 5, l. 8-15; Tab D – NFA Ex. 1.

26.     In her CPO Exemption Letter, Reisinger claimed to qualify for her exemption pursuant to Commission Regulation 4.13(a)(4), and stated that she "reasonably believes" all of the participants in the NCCN LLC pool were "qualified eligible participants" ("QEPs") at "the time of investment." *Id.*

Response: Disputed. Reisinger, as CEO of NCCN, claimed the exemption for the NCCN pool, whose CPO was ROF. Undisputed that she stated in the exemption claim that she reasonably believed all participants in the NCCN pool were either qualified as QEPs or otherwise qualified in accordance with CFTC Reg. 4.13(a)(4). Tab A – Reisinger Decl., ¶ 20; Pl. Ex. 4.

27.     The National Futures Association ("NFA") is the self-regulatory organization of the commodity industry charged with, among other things, processing applications for exemptions from the requirement to register as a CPO. Exhibit 5, Certified Copy of Michelle Spight's September 13, 2012 testimony excerpts, 4: 1-22; 12:1-14.

Response: Undisputed.

28.     Michelle Spight is an NFA employee who worked in the Compliance Department of the NFA in June of 2005, who was called to testify as the designee of the NFA.  *Id*.  She testified that Reisinger's CPO Exemption Letter was stamped by the NFA with "NFA Compliance, June 24, 2005." *Id*., 11: 1-9.

Response: Undisputed, except that the CPO Exemption Letter was filed by Reisinger as

CEO for NCCN and not on her own behalf, and the CPO of NCCN was ROF.  Tab A – Reisinger

Decl., ¶ 20.

29.     Spight testified that the NFA marked Reisinger's CPO Exemption Letter with a "NFA Compliance: Received June 24, 2005" stamp on the day the NFA received the document on date it was received.  *Id*., 7: 1-24, 8: 1-24.

Response: Disputed.  Spight had no personal knowledge of whether the CPO exemption

claim was stamped on the date it was received because she did not stamp it and did not know

who stamped it, no log of incoming mail was kept, and the envelope in which incoming mail

came was not kept.  In addition, the exemption claim was filed by Reisinger as CEO for NCCN,

and the CPO of NCCN was ROF.  Tab A – Reisinger Decl., ¶ 20; Tab B – Spight Dep. Excerpts,

p. 7, l. 7-23; p. 9, l. 2-18.

30.     Spight testified that she had the original of Reisinger's CPO Exemption Letter, that the original had fold marks indicating it was delivered via mail, not facsimile.  *Id*., 8: 6-24, 9: 1.

Response: Undisputed, except that the CPO Exemption Letter was for NCCN, whose

CPO was ROF, and not for Reisinger.  Tab A – Reisinger Decl., ¶ 20.

31.     Spight testified that in May – June 2005 part of her job at the NFA was to review claims for CPO exemptions, and that she personally reviewed Reisinger's CPO Exemption Letter.  *Id*. 12: 8-14.

Response: Undisputed, except that the CPO Exemption Letter was for NCCN, whose

CPO was ROF, and not for Reisinger.  Tab A – Reisinger Decl., ¶ 20.

32.     Spight testified that when she received Reisinger's CPO Exemption Letter, it was already stamped "Received June 24, 2005" and bore Reisinger's signature.  *Id*., 12:15-20.

Response: Undisputed, except that the CPO Exemption Letter was for NCCN, whose CPO was ROF, and not for Reisinger. Tab A – Reisinger Decl., ¶ 20.

33. Spight testified that Reisinger was the CPO because: "According to the document, the person who signed it [the CPO Exemption Letter] would be the person who is filing the exemption would be considered our CPO." *Id.*, 14:6-9.

Response: Testimony is undisputed but fact is disputed, because Reisinger did not identify herself as CPO but rather as CEO, which signified that she was CEO of NCCN, and NCCN's CPO was ROF. Tab A – Reisinger Decl., ¶ 20.

34. Matthews participated in the NCCN LLC pool through his entity Sundial Timepiece. Exhibit 7, Certified Copy of Reisinger September 23, 2008 testimony excerpts, 61:9-21.

Response: Undisputed, except the entity was Sondial Timepeace, LLC. However, this statement is incomplete because Matthews also participated through F Flat Major, LLC. Tab A – Reisinger Decl., ¶ 13.

35. Matthews testified that he would not have participated in the NCCN LLC pool if he had known that Reisinger was operating it as an unregistered CPO. Exhibit 11, Certified Copy of Larry Alan Matthews December 6, 2012 testimony, excerpts, 27:1-14; 28:1-5.

Response: Testimony is undisputed but fact is disputed, because Matthews was himself more involved in operating the pool than Reisinger. Matthews solicited Caffray to participate in the NCCN pool, authorized Reisinger to sign his name as signatory on the Customer Agreement for NCCN's account at Cadent, Matthews personally guaranteed the NCCN amount at Cadent, and as treasurer of ROF, Matthews controlled the funds of NCCN. In addition, Reisinger provided Matthews and other NCCN investors with a copy of the exemption claim which disclosed the exempt status of the NCCN pool. Tab A – Reisinger Decl., ¶s 7, 13, 30, 31; Pl. Ex. 18, p. 35.

36.     Reisinger never provided any of the prospective participants in the NCCN LLC pool, including the Australian/Tongan prospective participants in the NCCN LLC pool, the required written statement described in Commission Regulation 4.13(a)(5)(i)(A), nor did she provide any of the Australian/Tongan prospective pool participants with the written description of the criteria pursuant to which she claimed to qualify for an exemption described in Commission Regulation 4.13(a)(5)(i)(B).  Exhibit 12, Reisinger's Responses to CFTC's First Set of Interrogatories, 4, Response to Interrogatory No. 9.

        Response: Disputed.  Reisinger provided all prospective participants in the NCCN pool

the written statement described in Commission Regulation 4.13(a)(5)(i)(A) and (B) when she

mailed a copy of the exemption form to each participant, including Donald Caffray, as trustee of

the Donald Caffray Attorney Trust Account, on May 5, 2005.  To Reisinger's knowledge, there

were no Australian/Tongan participants in the NCCN commodity pool, at that time or at any

other time.  The Donald Caffray Attorney Trust Account was a participant, and to the extent

anyone in Tonga or Australia was a client of Caffray, or invested with Caffray, or otherwise

placed funds in the Donald Caffray Attorney Trust Account, their relationship was with Caffray,

and not with NCCN.  Tab A – Reisinger Decl., ¶s 9, 21, 24, 25.


37.     Reisinger could not have provided the required written disclosures to the Australian/Tongan participants - when they were prospective participants - because she testified the first time she learned of them was after she received their funds in June 2006.  Exhibit 7, Certified Copy of Reisinger September 23, 2008 testimony excerpts, 63:22; 64:1-7; 65:6-10; 111:17-22; 112:1-22; 113:1-22; 114:1-13.

        Response: Undisputed that Reisinger did not know of Australian/Tongan participants in

the Donald Caffray Attorney Trust Account until May or June 2006.  This allegation is otherwise

disputed, because there were no written disclosures required to be given by Reisinger at any time

to the Australian/Tongan persons, because these persons did not invest in NCCN, but rather they

were clients of Caffray or otherwise made an investment with Caffray.  Tab A – Reisinger Decl.,

¶s 9, 21, 24, 25.

38.     Reisinger filed her CPO Exemption Letter without first having provided the written statements required to be provided to prospective participants in order for her to be eligible to claim an exemption from the requirement to register as a CPO.  Exhibit 12, Reisinger's Responses to CFTC's First Set of Interrogatories, Response to Interrogatory Nos. 4, 6 and 9.

Response: Disputed.  The CPO exemption claim was not Reisinger's, but rather was for

NCCN whose CPO was ROF.  Reisinger sent each participant in the NCCN pool a copy of the

CPO exemption claim on May 5, 2005, the same day she filed it with NFA.  Tab A – Reisinger

Decl., ¶s 20, 21.

39.     On June 21, 2006, Matthews sent Reisinger an email from the email address "dgreisi@kdsi.net" with the subject line "don caffray's clients."  In the email to Reisinger, Matthews lists the "figures I came up with" for the following entities: "Quality Safety Mgmt," "Secured Bond," "PJCB" and "Tonga Church."  He closes the email with: "Respond tonight if possible and I'll fax to Don.  The funds will be in his account tonight at midnight."  Exhibit 18, Declaration of Larry Alan Matthews and authenticated documents, July 21, 2006 email at bates 0160.  Matthews authenticated this email.  *Id*. at pp. 1-2.

Response: Undisputed.

40.     On June 22, 2006, Reisinger emailed her response to Matthews bearing the same subject line: "Where did you get the amount for pbjcb (sic) account i (sic) think that is where the error is also on Secured Bond it was my understanding the total was 517 before 119 went back. Lisa" *Id*.  Matthews authenticated this email.  *Id*. at pp. 1-2.

Response: Undisputed.

41.     As of June 21, 2006, Reisinger had personal knowledge of Michelle Hughes, the amount the Hughes/State Management Ltd. deposited in the NCCN LLC pool, and the manner in which the funds were deposited into the NCCN LLC pool.  Specifically, as of June 21, 2006, Reisinger knew that Michelle Hughes and State Management Ltd. had deposited $292,777 into the NCCN LLC pool thru Caffray.  *Id*. at bates 0160.

Response: Disputed.  Reisinger received information on June 21, 2006 that Hughes and

State Management claimed to have placed $292,777 with Caffray, but she did not have personal

knowledge as to whether that was true, and the Donald Caffray Attorney Trust Account was the

participant in the NCCN pool, not Hughes or State Management.  Tab A – Reisinger Decl., ¶s 9, 24, 25.

42.     Reisinger testified that she personally contacted Michelle Hughes by email and the telephone.  Exhibit 9, Certified Copy of Reisinger January 26, 2010 testimony excerpts, 484: 1-5.

        Response: Undisputed.

43.     On June 21, 2006, Reisinger sent an email to Michelle Hughes with the subject line "Re: return of Principal (sic) contribution" from the email address "dgreisi@kdsi.net" that stated:

"Michelle,
According to the bank records I have obtained from yourself and Don Caffray, you deposited thru Don Caffray a total of 292,777.00 and return of principal has been 160,893.00 to date which would leave a balance of 131,884.00.
Is this correct?
Regards
Lisa"

*Id.*
        Response: Disputed, because Reisinger has been unable to confirm authenticity and

plaintiff has not otherwise authenticated this email.  Tab A – Reisinger Decl., ¶ 32.

44.     On December 7, 2006 Reisinger sent an email from the email address "dgreisi@kdsi.net" to Matthews with the subject line "WIRE TO NCCN" in which she stated:

"Hi Alan,
I have asked 79,900.00 to be wired out on the profitable accounts please can you figure out what the Church of Tonga's profit is on that.  David Collard said he thought there was 250k left there for them of the total fund.
I need this information tonight if possible.
Thanks,
Lisa"

Exhibit 18, Declaration of Larry Alan Matthews and authenticated documents, December 7, 2006 email at bates 0164.  Matthews authenticated this email.  *Id.* at pp. 1-2.

        Response: Undisputed.

45.     On December 28, 2006, Brian J. Wood sent Caffray a letter on "B International, Ltd." letterhead confirming a wire transfer in the amount of "USD $335,465.68 for our Integrity Plus Fund. This should bring us up to a total of USD $1,590,069.38" *Id.*, at bates 0150.  Matthews

authenticated this document. *Id*. at pp. 1-2. Exhibit 7, Certified Copy of Reisinger September 23, 2008 testimony excerpts, 37:7-22; 38: 1-10.

Response: Disputed. Matthews was incompetent to authenticate this document because he was not listed as a sender or recipient, and did not establish that he had personal knowledge as to whether it was authentic. He made the conclusory statement that he "authenticates the materials" he located, but he did not provide sufficient foundation testimony to authenticate this document. Pl. Ex. 18.

46.     Reisinger she testified that she received a copy of the December 28, 2006 letter via telefax. *Id*.; Exhibit 7, Certified Copy of Reisinger September 23, 2008 testimony excerpts, 107:1-18. Matthews authenticated this document. *Id*. at pp. 1-2.

Response: Undisputed that Reisinger received a copy of this letter via telefax. Disputed that Matthews authenticated this for same reason as stated in response to paragraph 45. Pl. Ex. 18.

47.     On December 28, 2006, Reisinger sent Matthews an email with the subject line "FW: Wire Transfer to D. Caffray – Integrity Plus Fund." Exhibit 18, Declaration of Larry Alan Matthews and authenticated documents, December 28, 2006 email at bates 0163.

Response: Undisputed.

48.     Matthews authenticated both the December 28, 2006 letter and email identified above. *Id*. at pp. 1-2.

Response:  Undisputed that Matthews authenticated the December 28, 2006 email he received from Reisinger. Disputed that Matthews authenticated the December 28, 2006 letter for the same reason as stated in response to paragraph 45. Pl. Ex. 18.

49.     On January 6, 2007, Reisinger sent an email to Brian Woods from the email address "dgreisi@kdsi.net" with the subject line "Integrity fund" that stated:

"Hi Brian
I have a question for you.
The total that you sent on the fax after this last amount of 335k was 1,590,000.

15

Does this include the Tonga church money of 249918.00? That is the only amount added to what we had that comes to that amount?
Thanks,
Lisa"

*Id.* at bates 0173. Matthews authenticated this email. *Id.* at pp. 1-2.

      Response: Undisputed that this email was sent. Disputed that Matthews authenticated

this email because he was not listed as sender or recipient, and did not establish that he had

personal knowledge as to whether it was authentic. Pl. Ex. 18.

50.     Reisinger testified that her email address throughout the relevant period was
dgreisi@kdsi.net. Exhibit 7, Certified Copy of Reisinger September 23, 2008 testimony
excerpts, 124:22; 125;1-2.

      Response: Undisputed.

51.     Reisinger stated in her response to the Commission's First Request for Admissions,
Request 18, which asked that she admit the genuineness of the June 21, 2006, email Reisinger
sent from her email address "dgreisi@kdsi.net" to Michelle Hughes with the subject line "Re:
return of Principal (sic) contribution," that: "Defendant has made reasonable inquiry and the
information she knows or can readily obtain is insufficient to enable her to admit or deny."
Exhibit 13, Reisinger's Responses to CFTC's First Request for Admissions, 4.

      Response: Undisputed as to Reisinger's response, but disputes the assumption in this

statement that she sent the email, because she has been unable to confirm that it is authentic. Tab

A – Reisinger Decl., ¶ 32.

52.     Reisinger accepted funds from participants in the NCCN LLC pool for the purpose of
trading in commodity futures on or subject to the rules of a contract market, and options on
commodity futures, during the relevant period identified in the Complaint. Exhibit 17,
Declaration of George Malas, January 8, 2013, ¶¶ 23-27.

      Response: Disputed. Reisinger received no funds from any participants in the NCCN

LLC pool. Participants in the NCCN pool either sent funds to their own accounts at Morgan

Keegan, and then authorized the funds to be transferred to the NCCN account at Morgan

Keegan, from which they were transferred to the NCCN account at Cadent, or they sent funds to

ROF whose bank accounts were controlled by Matthews, and these funds were sent by Matthews

to the NCCN account at Cadent. Tab A – Reisinger Decl. ¶s 7, 13, 20.

53.     Reisinger admitted that she never provided the following entities with a statement in writing stating (a) that the CPO of the NCCN pool was exempt from registration with the Commission as a CPO and that therefore, unlike a registered CPO, was not required to deliver a Disclosure Document and a certified annual report to participants in the NCCN pool, and (b) a description of the criteria pursuant to which the CPO of the NCCN pool qualified for such exemption from registration: Integrity Plus Fund; Hunter Valley Transport; Ltd., G.P. Global, Ltd.; Secured Bond, Ltd.' State Management Ltd.; Tokaikolo Christian Church; Quality Safety Management; and P.J.C.B. International , Ltd. Exhibit 12, Reisinger's Responses to CFTC's First Set of Interrogatories, Answer 9; Exhibit 11, Certified Copy of Larry Alan Matthews December 6, 2012 testimony, excerpts, 92: 9-25; 93: 1-25; 94: 22-25; 95: 1-5.

        Response: Undisputed.

54.     Each of the entities identified above were pool participants who sent their funds into the NCCN LLC pool thru Caffray. *Id.*

        Response: Disputed. To Reisinger's knowledge, none of the entities listed in paragraph

53 sent any funds to Morgan Keegan, ROF or NCCN to be managed by NCCN. Tab A –

Reisinger Decl., ¶ 26.

55.     Reisinger testified that she first knew that funds from unknown participants had been deposited into the NCCN LLC pool in May 2006:

        Q: At what point in time did you first learn that money was coming in from third parties
        through Mr. Caffray?
        A May of '06.
        Q What happened in May of '06?
        A I received a -- it was either a fax or an e-mail that I provided to the Commission from a
        company called State Management Limited.
        Q What's your recollection of that?
        A That they were a company that wanted to -- that were investors with Mr. Caffray and
        they wanted their money back.

Exhibit 7, Reisinger testimony, September 23, 2008, 51:21-22; 52:1-10. Exhibit 8, Reisinger testimony, January 26, 2012, 481-484.

Response: The testimony is not disputed, but the statement that funds from unknown participants had been deposited into the NCCN pool account is disputed. The Donald Caffray Attorney Trust Account sent funds to Morgan Keegan or ROF. Funds sent to Morgan Keegan were transferred to the NCCN account at Morgan Keegan at the direction of Caffray, and from there to the NCCN account at Cadent. Funds sent to ROF were controlled by Matthews, who caused the funds sent from the Donald Caffray Attorney Trust Account to be deposited in the NCCN account at Cadent. Matthews, who was treasurer of ROF, which was the CPO of the NCCN pool, handled the funds of investors in NCCN. To Reisinger's knowledge, State Management did not deposit funds with Merrill Lynch, Morgan Keegan, ROF or NCCN. Tab A – Reisinger Decl., ¶s 7, 12, 13, 20, 25, 26.

56.    Reisinger testified that she was unsure of the actual source of the funds in the NCCN LLC commodity pool, stating that she "did not know." Exhibit 7, Certified Copy of Reisinger September 23, 2008 testimony excerpts, 24:5-18.

Response: Disputed, because this is an incomplete excerpt of her testimony. Reisinger knew the participants who invested funds with NCCN. She did not know the identities of all the clients or investors of Caffray who sent funds to the Donald Caffray Attorney Trust Account. Tab A – Reisinger Decl., ¶s 25, 26.

57.    Throughout the relevant period, Reisinger and ROF directed NCCN's transactions involving futures contracts and options on futures contracts, among other financial instruments. Exhibit 8, Reisinger testimony, January 25, 2012 106:14-17.

Response: Disputed. Initially Ty Andros, and later Reisinger, chose professional advisors who directed NCCN's transactions in futures and options on futures, and it was not throughout the relevant period, but only during the period of May 18, 2005 through January 30, 2008. Reisinger did not make any individual trades on behalf of the NCCN pool. Tab A – Reisinger Decl., ¶ 27.

58.     Reisinger testified under oath that she was the CPO of the NCCN pool:

    Q: You were the operator of the NCCN pool, correct?
    A: Yes.  Well, not the commodity – I was the one that put the trades on, yes.

Exhibit 8, Certified Copy of Reisinger January 25, 2010 testimony excerpts, 106:14-17.

    Response:  Testimony is undisputed, but plaintiff's statement that she testified she was

CPO of the NCCN pool is disputed.  The answer in this testimony was qualified and states that

she put trades on for NCCN.  She did so by hiring professional advisors, but she did not directly

make any individual trades on behalf of the NCCN pool.  ROF was the CPO of the NCCN pool,

and Matthews, as treasurer of ROF, handled the funds of NCCN.  Tab A – Reisinger Decl., ¶s 7,

20, 27.

59.     Matthews testified at his deposition that Reisinger was the CPO of the NCCN LLC
commodity pool.  Exhibit 11, Certified Copy of Larry Alan Matthews December 6, 2012
testimony, excerpts, 21:13-15.  Matthews also testified that Caffray was a conduit for funds from
Australian/Tongan participants in the pool and that Reisinger was aware Caffray was acting as a
conduit.  *Id*., 148:18-20; 149:9-18.

    Response: Undisputed that Matthews testified that Reisinger was CPO of the NCCN

pool, but Reisinger disputes the fact.  ROF, whose bank accounts were controlled by Matthews,

was the CPO.  Undisputed that Matthews testified that Caffray was a conduit, but the fact is

disputed.  Also disputed that Reisinger knew Caffray was acting as a conduit.  Caffray was an

attorney, and Reisinger understood he had clients whose funds were in the Donald Caffray

Attorney Trust Account.  To Reisinger's knowledge, Caffray, as an attorney, was entitled to open

accounts in the name of the Donald Caffray Attorney Trust Account, and did so both at the bank

where the account was located and at Merrill Lynch, at Morgan Keegan, and possibly at other

firms as well.  Caffray, as an attorney with duties to his clients, exercised judgment in investing

their funds in multiple investments, and did not act as a mere conduit.  Tab A – Reisinger Decl.,

¶s 20, 24, 33.


60.     Reisinger testified that she first knew that funds from unknown participants had been
deposited into the NCCN LLC pool in May 2006:

> Q: At what point in time did you first learn that money was coming in from third parties
> through Mr. Caffray?
> A May of '06.
> Q What happened in May of '06?
> A I received a -- it was either a fax or an e-mail that I provided to the Commission from a
> company called State Management Limited.
> Q What's your recollection of that?
> A That they were a company that wanted to -- that were investors with Mr. Caffray and
> they wanted their money back.

Exhibit 7, Certified Copy of Reisinger September 23, 2008 testimony excerpts, 51:21-22; 52:1-
10. Exhibit 9, Certified Copy of Reisinger January 26, 2010 testimony excerpts, 481-484.

> Response: Disputed.  This is identical to paragraph 55 and the response is the same.


61.     Reisinger described in her testimony receiving documents as early as May 2006
concerning pool participants who were depositing funds thru Caffray, and she had no prior
knowledge or dealings with these participants:

> A Once I received those third-party documents, I became extremely suspicious that there
> was additional -- or there might have been clients in the Donald Caffray Attorney Trust
> account.
> Q When did you receive those documents?
> A *The first document that I received would have been May of '06, I believe. And it was
> from a company called State Limited Management that made an inquiry to Mr. Alan
> Matthews.*  And I not only -- by that time Mr. Hobbs had already made claim to the
> introduction of the Donald Caffray Attorney/Client Trust account, and so at that time I
> made inquiries to David.  I made inquiries to Mr. Matthews.  I made inquiries to State
> Management Limited.  It was my -- I was told at that time that Mr. Donald Caffray had a
> number of accounts and a number of brokerage relationships.  And, once again, I went
> back to the account opening documents that were transferred to us from Morgan Keegan -
> - that were given to us by Morgan Keegan and back to the qualified eligible participant
> document that Mr. Caffray filled out.  All I had to go off of was the paperwork.
> Q Did you become aware of any entities other than State Management?
> A Yes.
> Q Which entities were they?
> A *I also received in May of '06 a document from Secured Bond, Mr. Donald -- or Mr.
> David Collard.  Then I received a document from -- and these documents came to me*

*third party by Alan Matthews. The next document that I received -- and I've submitted all these to the Commission. The next document that I received would have been January of 2007. And I was cc'd on a document, but I received that document from Mr. Alan Matthews where Idylic was talking to Don Caffray about their investment that they had -- or not Idylic -- excuse me -- Integrity Fund had with Mr. Donald Caffray.* I inquired about that. I asked for audits to be done. I asked for information to be provided to me. I, again, went back to Mr. Chuck Weed. I asked him again. I also asked the broker, Brian Thornton at Merrill Lynch that opened up the Merrill Lynch account, if it was -- what his understanding of the origination of those funds were. I inquired to Mr. David Hobbs. And I could not -- I could not connect the funds in the NCCN pool with those parties and verify that. Then the last document that I received was a company called -- Quality Safety Management I believe was the name of that. There was a phone number on that one and I picked up the phone and called. (emphasis supplied)

Exhibit 9, Certified Copy of Reisinger January 26, 2010 testimony excerpts, 481: 22-24; 482: 1-14; 483: 1-24; 484: 1-5.

Response: The testimony is undisputed but the statement that there were pool participants depositing funds through Caffray is disputed, because the participant who invested in the pool was the Donald Caffray Attorney Trust Account. Tab A – Reisinger Decl., ¶ 26.

62. Reisinger further testified:

BY MS. DODDS:
    Q Did your understanding about that change at any point in time?
    A Once I received those third-party documents, I became extremely suspicious that there was additional -- or there might have been clients in the Donald Caffray Attorney Trust account.
    Q When did you receive those documents?
    A The first document that I received would have been May of '06, I believe. And it was from a company called State Limited Management that made an inquiry to Mr. Alan Matthews. And I not only -- by that time Mr. Hobbs had already made claim to the introduction of the Donald Caffray Attorney/Client Trust account, and so at that time I made inquiries to David. I made inquiries to Mr. Matthews. I made inquiries to State Management Limited. It was my -- I was told at that time that Mr. Donald Caffray had a number of accounts and a number of brokerage relationships. And, once again, I went back to the account opening documents that were transferred to us from Morgan Keegan -- that were given to us by Morgan Keegan and back to the qualified eligible participant document that Mr. Caffray filled out. All I had to go off of was the paperwork.
    Q Did you become aware of any entities other than State Management?
    A Yes.
    Q Which entities were they?
    A I also received in May of '06 a document from Secured Bond, Mr. Donald -- or Mr. David Collard…. Then the last document that I received was a company called -- Quality

Safety Management I believe was the name of that. There was a phone number on that one and I picked up the phone and called.

Exhibit 9, Certified Copy of Reisinger January 26, 2010 testimony excerpts, 478: 3-24; 479: 1-24; 480: 1-24; 481: 1-24; 482: 1-24; 483: 1-24; 484: 1-5.

Response: This is substantially duplicative of paragraph 61, and the response to

paragraph 61 is hereby incorporated by reference.

63. Reisinger testified that she has only one email address: dgreisi@kdsi.net. Exhibit 6, Reisinger testimony, May 20, 2008, 16:24; 17:1-3; 27, 21-14; 28, 1.

Response: Undisputed.

64. Neither Reisinger nor ROF ever provided pool participants with the monthly Account Statements and Annual Reports that registered CPOs are obligated to provide to their pool participants. Exhibit 17, Declaration of George Malas, January 8, 2013, 8, ¶ 22.

Response: Undisputed.

65. Throughout the period that NCCN was operated as a commodity pool, no participant ever deposited a total of $5,000,000, as the total deposited from all participants during the time the pool's account at Cadent Financial Services, LLC was opened totaled only $2,753,378. *Id.*, pp. 8-9, ¶ 24(c); Order, 10, ECF No. 67.

Response: Undisputed, but qualified. This statement is correct as to the NCCN

commodity pool, but the commodity pool did not contain all investments in NCCN. Tab A –

Reisinger Decl., ¶ 12.

66. The single largest sum deposited into the NCCN LLC pool was approximately $1,000,000. Order, 10, ECF No. 67.

Response: Disputed. The Donald Caffray Attorney Trust Account deposited more than

$1,000,000 in the NCCN pool. Tab A – Reisinger Decl., ¶ 34.

67. At no point during the relevant period did Reisinger, a CPO and a fiduciary, correct her earlier representations to pool participants that the minimum deposit accepted by the NCCN pool was $5,000,000. Exhibit 17, Declaration of George Malas, January 8, 2013, 9, ¶ 25.

Response: Disputed.  Reisinger was not a CPO, and did not make this representation to

any pool participants.  Furthermore, there was no representation made that the NCCN pool had a

minimum investment of $5,000,000, because the NCCN pool did not exist at the time the

statement was made about funds to be managed by NCCN, and the statement related to a bond

trading program.  In addition, the Client Services Agreement for NCCN provided that the

minimum investment could be waived.  Reisinger believes that Matthews, who was the one who

handled funds invested for management by NCCN, waived the $5,000,000 requirement by

accepting less from at least some investors, and any person investing less would have known it.

Tab A – Reisinger Decl., ¶s 11, 12, 29.

68.     NCCN pool participants deposited funds with Reisinger and ROF starting on May 6,
2005 and continued to make deposits until January 10, 2007 into the NCCN pool account at
Cadent Financial Services, LLC.  *Id.*, pp. 8-9, ¶ 24(c).

Response: Disputed.  No funds were deposited with Reisinger.  Funds were deposited

with Morgan Keegan or ROF and then transferred to Cadent either directly, or through an NCCN

account at Morgan Keegan.  Tab A – Reisinger Decl. ¶ 7.

69.     Concerning the operation of the NCCN LLC pool, Reisinger testified:

"And what was your title?
A CEO.
Q You were the boss?
A I thought I was just picking traders at the time.
Q Who was in charge of NCCN during the relevant period?
A It was my understanding my responsibility was to manage the portfolio as far as picking
traders and allocating funds to traders.
Q So you were in charge?
A Of that part of it, yes.
Q Who ran the daily operations of NCCN during the relevant period?
A Please define daily operations.
Q Who made the business decisions, bought equipment, hired/fired employees, made sure money
was paid out to who had to be paid out, took money in, who had to be paid, who ran the company
on a daily basis, somebody's got to be the boss? It could be more than one person?
A I believe it was all four members."

Exhibit 7, Certified Copy of Reisinger September 23, 2008 testimony excerpts, 32:20-22; 33: 1-20.

      Response: Undisputed.

B.    <u>Reisinger's Statement of Additional Material Facts</u>

    1.    In 2005, Reisinger was a registered commodity broker with New World Holdings, LLC, a commodity futures introducing broker which introduced accounts to Cadent, a registered futures commission merchant.  Tab A – Reisinger Decl., ¶ 14.

    2.    In order to open an account at Cadent for a commodity pool, Cadent had documentation requirements, including a customer agreement, and documentation showing that the operator of the commodity pool was either registered as a CPO or exempt from such registration.  Tab A – Reisinger Decl., ¶ 15.

    3.    In Reisinger's capacity as a broker who introduced accounts, she completed a Cadent customer agreement for the NCCN account.  Tab A – Reisinger Decl., ¶ 16.

    4.    Matthews authorized Reisinger to sign his name as signatory for NCCN on the customer agreement for the NCCN account at Cadent.  Tab A – Reisinger Decl., ¶ 16; Pl. Ex. 18.

    5.    Matthews signed a personal guarantee for the NCCN account at Cadent.  Tab A – Reisinger Decl., ¶s 16, 30.

    6.    Reisinger co-signed the agreement for the NCCN account at Cadent, and submitted it to Cadent.  Tab A – Reisinger Decl., ¶s 16, 30.

    7.    The head of Cadent's New Accounts Department in 2005 was Cheryl Fitzpatrick-Smith ("Fitzpatrick"), who was also a licensed Illinois attorney and Cadent's General Counsel. Tab A – Reisinger Decl., ¶ 17.

8.  Fitzpatrick told Reisinger that the NCCN account at Cadent would be considered an exempt commodity pool, and that Cadent would not open an account for NCCN unless Cadent had a copy of the exemption claim for the exempt pool.  Tab A – Reisinger Decl., ¶ 17.

9.  Reisinger asked Fitzpatrick to assist her in obtaining an exemption for the NCCN commodity pool.  Tab A – Reisinger Decl., ¶ 18.

10.  Fitzpatrick provided Reisinger with language to include in the claim for an exemption for the NCCN commodity pool, and Reisinger prepared a CPO exemption claim, which Fitzpatrick told her was acceptable to Cadent for opening the account.  Tab A – Reisinger Decl., ¶s 18, 32.

11.  On May 5, 2005, Reisinger signed the CPO exemption claim.  Tab A – Reisinger Decl., ¶ 19; Tab D-NFA Ex. 1.

12.  On May 5, 2005, Reisinger provided a copy of the CPO exemption claim to Fitzpatrick to satisfy Cadent's new account requirement for an exempt commodity pool account. Tab A – Reisinger Decl., ¶ 19.

13.  On May 5, 2005, Reisinger sent copies of the exemption claim to National Futures Association ("NFA") – one by facsimile and one by either mail or federal express.  Tab A – Reisinger Decl., ¶ 19.

14.  Upon receipt of a copy of the exemption claim from Reisinger on May 5, 2005, Fitzpatrick approved the opening of the account for NCCN at Cadent.  Tab A – Reisinger Decl., ¶ 19.

15.  Beginning on May 6, 2005, funds of NCCN investors were transferred to the NCCN account at Cadent from the NCCN account at Morgan Keegan and from the ROF bank account.  Tab A – Reisinger Decl., ¶ 19.

16.     Reisinger signed the CPO exemption claim as CEO.  Tab A – Reisinger Decl., ¶ 20.

17.     The CPO notation next to Reisinger's name on the copy of the exemption claim form held by NFA was added by NFA.  Tab A – Reisinger Decl., ¶ 20; Tab B-Spight Dep. Excerpts, p. 5, l. 8-15; Tab D-NFA Ex. 1.

18.     The CEO designation on the exemption claim stated Reisinger's title at NCCN, which was the pool for which the exemption was being claimed.  Tab A – Reisinger Decl., ¶ 20.

19.     Reisinger considered ROF, and not herself, to be the CPO of the NCCN pool. Tab A – Reisinger Decl., ¶ 20.

20.     Funds for the NCCN pool that were not already at Morgan Keegan were sent to NCCN or ROF, and controlled by Matthews as treasurer of ROF, which was NCCN's managing member.  Tab A – Reisinger Decl., ¶ 20.

21.     Matthews directed the transfer of funds from the ROF account to the NCCN account at Cadent.  Tab A – Reisinger Decl., ¶ 20.

22.     When an investor wished to withdraw funds from the NCCN pool, Matthews had the funds transferred from the NCCN account at Cadent to an ROF account controlled by him, and he then wired the funds from ROF to the respective investor as requested.  Tab A – Reisinger Decl., ¶ 20.

23.     On May 5, 2005, Reisinger mailed a copy of the exemption claim to each of the investors in NCCN whose funds were going to included in the NCCN account at Cadent, including Donald Caffray as the trustee of the Donald Caffray Attorney Trust Account and Alan Matthews, as principal of Sondial Timepeace, LLC and F Flat Major, LLC.  Tab A – Reisinger Decl., ¶ 21.

24.     The following persons were all Qualified Eligible Persons within the meaning of

CFTC Reg. 4.7(a)(2)(xi):  Integrity Plus Fund; Hunter Valley Transport, Ltd.; G.P. Global, Ltd.;

Secured Bond, Ltd.; State Management, Ltd.; Tokaikolo Christian Church; Quality Safety

Management; and P.J.C.B. International, Ltd.

s/ William J. Nissen
William J. Nissen
Attorney for Defendant Reisinger

Of Counsel:
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: 312-853-7000

Dated: November 21, 2013

## CERTIFICATE OF SERVICE

I, William J. Nissen, an attorney, hereby certify that I have served copies of the foregoing Reisinger's Local Rule 56.1 Response to Plaintiff's Statement of Undisputed Material Facts in Support of the Motion for Summary Judgment and Additional Material Facts upon the following individuals by the court's ECF system on the 21st day of November, 2013.

Timothy J. Mulreany
U.S. Commodity Futures Trading Commission
Division of Enforcement
Three Lafayette Center
1155 21st Street, N.W.
Washington, D.C. 20581
tmulreany@cftc.gov

Elizabeth N. Pendleton
U.S. Commodity Futures Trading Commission
Division of Enforcement
525 West Monroe Street
Suite 1100
Chicago, IL 60661
ependleton@cftc.gov

Eugene Smith
U.S. Commodity Futures Trading Commission
Division of Enforcement
Three Lafayette Center
1155 21st Street, N.W.
Washington, D.C. 20581
esmith@cftc.gov

s/ William J. Nissen
William J. Nissen

CH1 8132338v.1